**United States District Court for the Southern District of New York**

| | | |
|---|---|---|
| Alexis Lorenzo | : | |
| | : | |
| vs | : | Civil Action No. |
| | : | |
| Legal Services of New York City | : | **Jury Trial Demanded** |

*Complaint*

Plaintiff, Alexis Lorenzo, brings a series of claims against Defendant, Legal Services of New York City, of which the following is a statement:

*Jurisdiction and Venue*

1. This Court has original jurisdiction to hear this Complaint and adjudicate the claims stated herein under 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 2000d-2. 2000e-5(f), this action being brought under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000d and 2000e, et seq. ("Title VII"), the Americans With Disabilities Act of 1990, as amended, Pub. L. 101-336, 42 U.S.C. § 12101 et seq. (the "ADA"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. (the "ADEA"), and the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991), to redress and enjoin the discriminatory and retaliatory practices of defendant. This Court may exercise supplemental jurisdiction over Lorenzo's state law claims pursuant to 28 U.S.C. §1367.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this case occurred in this judicial district.

3. Lorenzo timely filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights

(NYSDHR), received a Notice of Right to Sue ("NRTS") from the EEOC, and has commenced this action within 90 days of receipt of the NRTS.

## *Parties*

4. Plaintiff, Alexis Lorenzo, is a Black Latina female citizen of the United States and a resident of this judicial district.

5. Defendant, Legal Services of New York City ("LSNYC"), is a New York corporation that provides free legal assistance to qualified New York residents. It has a principal place of business located at 40 Worth Street, St Suite 606, New York, NY 10013..

6. At all times relevant to this action, defendant was an "employer" within the meaning of Section 1981, Title VII, the ADA, the ADEA, and applicable state law.

7. The acts set forth in this Complaint were authorized, ordered, condoned, ratified and/or done by defendant's officers, agents, employees and/or representatives while actively engaged in the management of defendant's business and pursuant to defendant's official policies and customs.

## *Background Facts*

8. Lorenzo is an attorney and began her employment with defendant in September 2010. She was last employed by defendant as the Director of the Neighborhood Stabilization Project ("NSP"), formerly known as the Foreclosure Prevention Unit, at defendant's Bronx borough office, Bronx Legal Services, located at 349 E. 149th Street, 10th Floor, Bronx NY 10451.

9. Over the 15 years of her employment with defendant, there has been a long-standing and pervasive culture of racism in defendant's Bronx Office that has been nurtured and advanced by its leaders. This culture allowed several supervisors there to discriminate, harass,

and retaliate against Lorenzo because of her race, age, and disability, including her prior direct supervisor Justin Haines, a White male, and the former Director of the Foreclosure Unit; her former indirect and current direct supervisor Christopher Lamb, a White male, and the Director of Litigation at the Bronx Office; her indirect supervisors Jill Siegel, a White female, and the former Deputy Project Director of the Bronx Office; and Jack Newton, a White male lateral manager, and the Director of the Public Benefits Unit. The culture of racism fostered by defendant's leadership also emboldened non-managerial White staff to harass and discriminate against Lorenzo.

10. As a staff attorney, Haines harassed and discriminated against Lorenzo. She also observed Haines treat the only other Black female attorney in the Unit, Tianna Biaz, motivated by racial animus. Haines' discrimination and harassment included his refusal to grant Lorenzo relief from intake and clinic staffing duties regardless of her high caseload and case deadlines, while routinely granting such relief to White male attorneys in the Unit whenever they requested. After Lorenzo complained in early 2014 to Haines' supervisor at the time, Chris Lamb, Haines retaliated against her by regularly assigning her to complex litigation cases involving extensive motion practice. When she requested relief from intake and clinic duties in order to work these cases, he shamed and embarrassed her in front of her colleagues and characterized her request as "diva behavior." He further retaliated against her by giving her a negative performance review. He continued to discriminate and retaliate against her by accusing her of "lazy lawyering," describing her as difficult, and casting her as the stereotypical "angry Black woman." Lorenzo complained to Haines' supervisor, Lamb, but Lamb minimized her concerns or dismissed them altogether.

11. Jill Siegel, a White female and defendant's former Deputy Project Director, discriminated against Lorenzo by excluding her from meetings and conversations she should have been included in by virtue of her position, and openly disadvantaged Lorenzo after she was promoted to Director of the Foreclosure Unit (NSP Unit), by defendant's former Project Director Jane Aoyama, an Asian female. Siegel opposed Lorenzo's promotion to Unit Director. During the seven years Lorenzo served as Director of the NSP Unit, Siegel did not support her, but did support Lorenzo's White counterparts: Jack Newton, a White male attorney and defendant's Director of the Public Benefits & LGBT Advocacy Unit from November 2016 to the present; Nannette Schorr, a White female attorney and defendant's Director of the Education Unit since at least 2007 to the present; Carolyn Norton, a White female attorney and defendant's Director of the Tenants Right Coalition (TRC) Unit from August 2017 to January 2022; and Paula Arboleda, a White female social worker and defendant's Deputy Director of the Public Benefits & LGBT Advocacy Unit from November 2017 to the present. For example, in January 2020, Siegel ignored Lorenzo's requests for assistance with fundraising for the NSP Unit, but assisted White Unit Directors such as Nanette Shore, Director of the Education Unit, and Newton, with fundraising efforts. Siegel excluded Lorenzo from listserv communications with defendant's lobbyists, thereby interfering with Lorenzo's ability to participate in key opportunities to offer testimony at hearings before elected officials, address funding issues, and review recently introduced legislation. In May 2020, at the height of the pandemic when Bronx Legal Services was mobilizing efforts to assist communities impacted by the pandemic, Siegel publicly embarrassed Lorenzo before her fellow managers when she refused to include services offered by my Lorenzo's Unit in a Covid-19 flyer, while including services for relief offered by the

4

Bronx Office's White Unit Directors. Siegel regularly demonstrated that she valued White managers and staff over Lorenzo, the only Black and Latino manager in the Bronx office.

12. Defendant's senior leadership treated seriously and gave license to a White female peer of Lorenzo to discriminate against her based on her alleged "smell." Anne Nacinovich occupied an office on the 9th floor of defendant's Bronx Office along with Lorenzo. In 2017, shortly after Lorenzo applied for the Unit Director position, Nacinovich began to openly complain about Lorenzo's "smell," and complained that it was making her sick. The 9th floor is a space with a large open floor plan that accommodates 57 desks. At the time Nacinovich began her harassment of Lorenzo, Nacinovich's office was located six doors down from Lorenzo. Nacinovich complained to defendant's central office located at 40 Worth Street, New York, NY. Nacinovich began using office space at defendant's 40 Worth Street location under the pretext that she could not be in the same building with Lorenzo because of Lorenzo's smell. This public display of revulsion by Nacinovich was extremely humiliating to Lorenzo and created an atmosphere of sustained harassment which was tolerated and enabled by defendant's senior leadership.

13. White subordinates who resisted Lorenzo's leadership of the NSP Unit verbally attacked her shortly after she was promoted to Unit Director in December 2017.

14. The racist culture and patterns of discrimination that permeate defendant's Bronx Office is so pervasive that Marie Richardson, a Black female, and the first Black Project Director for the Bronx office, was publicly, verbally attacked by two non-Black managers, Roland Nimis, a White male and Deputy Director of the Housing Unit and Natasia de Silva, an Asian female and the then Deputy Director of the TRC Housing Unit. The verbal attack occurred during a Bronx managers meeting on June 4, 2020, following the murder of George Floyd. Nimis and de

5

Silva berated Richardson for not issuing a Bronx-focused message on the public murder of George Floyd. Lamb and Siegel were present at the meeting. The racist culture and the patterns of discrimination at defendant's Bronx office also permitted attacks on other Black Females in leadership positions. Lamb verbally attacked and disrespected in a hostile manner two Black female leaders, Kirsten Soberanis, defendant's Chief Human Resources & Diversity Officer, Amelia Baker, defendant's Human Resources Manager. Lorenzo had never observed Lamb treat White male colleagues or managers in a similar fashion.

15. On December 11, 2023, defendant circulated a job posting for the Bronx Deputy Project Director position because Siegel was retiring from that position. Richardson reviewed and approved the posting that required candidates to have either a Juris Doctorate (JD) and admission to the New York Bar, or a Master's degree in Public Administration (MPA). The inclusion of a Master's degree as a qualification for a Deputy Project Director position was not consistent with prior or subsequent postings for the same position in any of defendant's other borough offices. The posting described the position as working collaboratively to fulfill the office's "overall mission of fighting poverty and seeking racial, social, and economic justice for Bronx residents." Bronx Legal Services was described as "committed to fight for a workplace that is as diverse, equitable and inclusive as possible for everyone," and referenced the office's "DEIB committee and numerous affinity groups". The posting listed the very first key function of the position as "cultivating and maintaining strong relationships with clients, local government offices, community-based organizations, and others."

16. Lorenzo was qualified for the position. She possessed a JD and had spent her entire career in defendant's Bronx office. She had depth and breadth of DEIB expertise resulting from the years she worked on defendant's DEIB committees and had well-established

6

relationships with Bronx elected officials, other New York City government officials, and community-based organizations. Richardson had shared with Lorenzo in conversations that Lorenzo was qualified to succeed her as the Project Director. In December 2023, Lorenzo applied for the position, as did Maribel Martinez-Gunter, a Black Latina female, and defendant's then Director of the Family Law Unit in defendant's Manhattan office.

17. On January 9, 2024, the initial job posting was rescinded and a second posting, drafted and approved by Siegel, superseding the first, was circulated with the explanation that the initial posting listed qualifications incorrectly in that only a Master's degree was required for the position, not a MPA. The second posting was tailor-made for Paula Arboleda, a non-Black female who did not possess either a JD or a MPA, but was Siegel's hand-picked candidate to replace her. Also in the second posting, the DEIB mission statements were removed to accommodate Arboleda's lack of DEIB expertise and experience. The importance of establishing and maintaining relationships with elected officials and stakeholders had been lowered from the first to the third responsibility and watered down to eliminate the requirement of having stakeholder relationships, which was consistent with Arboleda's lack of any such relationships. Most notable was the removal of a MPA as a requirement, replaced with the generic requirement of a Master's degree so that the position could be awarded to any applicant possessing the bare minimum of a non-specific graduate degree. Based on the lowered criteria, Arboleda was considered a qualified applicant, and she submitted an application.

18. Lorenzo complained to Richardson in a phone conversation about the change in the job posting, stating inter alia, that the second posting appeared to have been created in response to the applications already submitted by Lorenzo and Martinez-Gunter, and that the second posting compromised the integrity of the process. During the phone conversation,

7

Richardson confirmed that the revised posting was created because the first posting was not what Siegel wanted, the applicants who had already submitted their applications were not what Siegel wanted, and that Siegel made the changes herself and then submitted it to HR for circulation. Siegel's actions were racially motivated to ensure that Arboleda would be selected for the Deputy Director position and not Lorenzo.

19. On January 24, 2024, Richardson circulated an email to the Bronx Office inviting anyone interested in volunteering on the hiring committee for the Deputy Project Director search to contact her by email no later than Friday, January 26, 2024, because she wanted to schedule interviews for February 8 and 9, 2024. Following that email, Richardson began forming the hiring committee for the Deputy Project Director position. Because Siegel objected to Lorenzo's and Martinez-Gunter's applications for the position, Richardson structured a hiring committee that would ensure Siegle's preferred candidate, Arboleda, would be selected for the position.

20. In March 2024, Lorenzo was interviewed by the hiring committee. Martinez-Gunter and Arboleda were the only other candidates selected for an interview and were interviewed in March 2024. There were two additional internal Black female applicants who possessed equal or greater qualifications than Arboleda, neither of whom was chosen for an interview. The hiring manager, Lamb, never explained why these two applicants were not given interviews. Richardson had inexplicably removed herself as the hiring manager and substituted Lamb in her stead.

21. On March 26, 2024, Richardson called Lorenzo and explained that she was reviewing the interview evaluations, and that the hiring committee had referred only two candidates for her to interview – Arboleda and Martinez-Gunter. Lorenzo asked Richardson if she accepted the committee's decision and she said yes. Lorenzo reminded Richardson that in

8

prior conversations, she had encouraged Lorenzo to apply for the Deputy Director position, and told Lorenzo that she would be leaving the Project Director position soon and that Lorenzo could be the person to replace her. Lorenzo inquired how was it possible that she was the most qualified candidate between Maribel and Arboleda and yet she was not even referred for a second-round interview. Lorenzo also told Richardson she believed Siegel was continuing to discriminate and retaliate against her and had specifically rewritten the position description to favor Arboleda. Richardson remained silent. Richardson eventually said, "I'm reviewing the evaluations now and you did not tank the interview" "there were no negative comments about you." Lorenzo then asked Richardson "does that make sense to you" "doesn't that give you pause"? Richardson again remained silent. Lorenzo continued to ask about the criteria used to determine who should get a second interview and who should not, why two less qualified candidates were given second interviews and she was not, and if no one said anything negative about her, why did she not get a second interview. Richardson did not respond to Lorenzo's questions.

22. A few days later, after being completely erased from the hiring process, Raul Rasmussen, defendant's then Executive Director, asked Lorenzo, not Arboleda or Martinez-Gunter, to lobby a state senator from the Bronx for millions of dollars in funding for defendant, a critical function of the Deputy Project Director position.

23. On May 20, 2024, Lorenzo went out on medical leave for severe anxiety and Post Traumatic Stress Disorder triggered and induced by the long-standing and ongoing discriminatory and hostile work environment at defendant's Bronx Office.

24. In March 2024, Tara Lambert, a mixed race, register member of the Metis Nation in Canada, female and defendant's Director of the Social Work Unit at defendant's Bronx office,

9

and a member of the hiring committee for the Deputy Director position, filed a complaint alleging race and age discrimination in the hiring process. Lambert alleged that the hiring process had been corrupted and was biased to ensure the selection of a specific and far less qualified candidate for the Deputy Director position, Arboleda.  She also alleged that there was a long-standing pattern and practice of racial bias in hiring and promotion at defendant.

25. Shortly after Lambert filed her discrimination complaint with HR, defendant retained Robinson & Cole LLP to conduct an investigation into the claims raised in her complaint.  The investigation began in April 2024.  In May 2024, while Lorenzo was out on medical leave, lawyers from Robinson & Cole LLP repeatedly contacted her harassing her into scheduling an interview with them. They persisted even when informed that Lorenzo was out on medical leave and despite the fact that she was not a decision maker in the hiring process nor did she file the complaint that triggered their involvement. Their actions exacerbated Lorenzo's level of distress and symptoms of anxiety that necessitated her leave in the first place.

26. In September 2024, Robinson & Cole LLP issued a report on their investigation, which substantiated the claim that Siegel had interfered with the hiring process related to the Deputy Project Director position in an effort to ensure the selection of Arboleda.

27. At an October 2024, Bronx Board of Directors meeting, defendant announced that an offer was being made to fill the Deputy Director position, and on December 3, 2024, Martinez-Gunter started in the role of Deputy Project Director at defendant's Bronx office.

28. On January 17, 2025, Lorenzo submitted a Charge of Discrimination to the EEOC and the NYSDHR asserting that defendant had discriminated and retaliated against her because of her age and race.

29. On January 21, 2025, Lorenzo submitted an Amended Charge of Discrimination to the EEOC and the NYSDHR again asserting that defendant had discriminated and retaliated against her because of her race and age. That same day, she advised Richardson and Kirsten Soberanis, defendant's Chief Human Resources and Diversity Officer, by email that she would return to work effective January 21, 2025, and that she would be requesting an accommodation.

30. On January 21, 2025, Lorenzo submitted to defendant a Request for Reasonable Accommodations. She requested to work fully remote for six months and to gradually return to in-office interpersonal interaction and occupational functioning. *See* Exhibit A attached hereto, incorporated herein, and made a part hereof.

31. On January 29, 2025, defendant responded to Lorenzo's accommodation request. Defendant granted what it characterized as a partial approval, but in actuality was a denial. Defendant imposed upon Lorenzo conditions for her accommodation that were the exact opposite of what she requested. *See* Exhibit B attached hereto, incorporated herein, and made a part hereof.

32. Defendant's response to Lorenzo's accommodation request was not an approval, but was in effect a denial characterized as an approval. Moreover, after she returned to work from medical leave on January 29, 2025, she was subjected to retaliatory, discriminatory, and harassing conduct based on her disability and race. As a result of that conduct, on February 7, 2025, Lorenzo filed an internal complaint with defendant that outlined the discriminatory, retaliatory, and harassing actions she had been subjected to, and how those actions resulted in the creation and perpetuation of a hostile work environment. *See* Exhibit C attached hereto, incorporated herein, and made a part hereof.

33. Shortly thereafter, on March 12, 2025, defendant submitted to the EEOC its Position Statement with respect to Lorenzo's Amended Charge of Discrimination, denying all of her allegations.

34. Defendant's discriminatory, harassing, and retaliatory actions against Lorenzo continued, and included removing her from any responsibility with respect to the Baychester case, micromanaging her work on other cases, undermining and humiliating her with respect to her direct reports, and weaponizing the ADA accommodation process to engage in hyper-scrutiny and continue a hostile work environment.

35. Defendant effectively characterized Lorenzo's February 7, 2025 complaint as a request for a reasonable accommodation to perform the essential functions of her position. On April 30, 2025, defendant, on its own volition, extended Ms. Lorenzo's current accommodation for an additional three months. *See* Exhibit D attached hereto, incorporated herein, and made a part hereof.

36. On May 4, 2025, Lorenzo submitted a Second Amended Charge of Discrimination to the EEOC and the NYSDHR asserting that after submission of the Amended Charge of Discrimination, defendant continued to discriminate and retaliate against her because of her age and race, and also had discriminated and retaliated against her because of her disability. *See* Exhibit E attached hereto, incorporated herein, and made a part hereof.

37. As the natural and intended consequence of the discriminatory and retaliatory actions and omissions of defendant described above, Lorenzo's work conditions became so intolerable that she, like any other reasonable person in similar circumstances, had no alternative other than to leave defendant. Defendant constructively discharged Lorenzo effective August 22, 2025.

38. Lorenzo has suffered, is now suffering, and will continue to suffer emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses as a direct and proximate result of defendant's discrimination and retaliation.

39. By reason of defendant's discrimination and retaliation, Lorenzo suffered extreme harm, including loss of income and other employment benefits, loss of professional opportunities, embarrassment and humiliation.

40. Defendant acted and failed to act willfully, maliciously, intentionally, and with reckless disregard for Lorenzo's rights.

41. Defendant's actions and omissions described above constitute discrimination, harassment, and retaliation against Lorenzo because of her race in violation of Title VII of the Civil Rights Act of 1964, as amended, and Section 1981, because of her age in violation of the Age Discrimination in Employment Act, because of her disability in violation of the Americans With Disabilities Act, and because of her age, race, and disability in violation of the New York Human Rights Law.

42. Defendant constructively discharged Lorenzo because of her race, age, and disability, perceived disability, or record of having been disabled, and in retaliation for her complaints about defendant's race, age, and disability discrimination, all in violation of Title VII, Section 1981, the ADA, the ADEA, and the New York Human Rights Law.

### Count I

### *The Americans With Disabilities Act, 42 U.S.C. §12101 et seq.*

43. Plaintiff restates and realleges paragraphs 1-42, inclusive, as though set forth here in full.

44. Because of her diagnosis of severe anxiety and PTSD, Lorenzo had a disability within the meaning of the ADA.

45. Defendant discriminated and retaliated against Lorenzo, a qualified individual with a disability, by failing to make reasonable accommodations to her known limitations, and by otherwise discriminating and retaliating against her because of her disability, in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12111-12117.

46. By reason of defendant's discrimination and retaliation, Lorenzo is entitled to all legal and equitable relief available under the ADA.

## Count II

*Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000d and 2000e et seq.*

47. Plaintiff restates and realleges paragraphs 1-46, inclusive, as though set forth here in full.

48. Lorenzo had a federal statutory right under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000d and 2000e et seq. ("Title VII"), to be accorded the same rights as were enjoyed by White employees with respect to the terms and conditions of their employment relationship with defendant and to the enjoyment of all benefits, privileges, terms and conditions of that relationship.

49. Defendant's conduct deprived Lorenzo of the rights, privileges and immunities guaranteed to her under Title VII.

50. By reason of defendant's discrimination and retaliation, Lorenzo is entitled to all legal and equitable relief available under Title VII.

## Count III

*The Civil Rights Act of 1866, 42 U.S.C. §1981*

51. Plaintiff restates and realleges paragraphs 1-50, inclusive, as though set forth here in full.

52. Lorenzo had a federal statutory right under the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Section 1981"), as amended, to be accorded the same rights as were enjoyed by White employees with respect to the terms and conditions of their employment relationship with defendant and to the enjoyment of all benefits, privileges, terms and conditions of that relationship.

53. Defendant's conduct described above deprived Lorenzo of the rights, privileges and immunities guaranteed to her under Section 1981.

54. By reason of defendant's race discrimination and retaliation, Lorenzo is entitled to all legal and equitable relief available under Section 1981.

### Count IV

*The Age Discrimination in Employment Act, 29.U.S.C. §§621-634*

55. Plaintiff restates and realleges paragraphs 1- 54, inclusive, as though set forth here in full.

56. Lorenzo had a federal statutory right under the ADEA to be accorded the same rights as were enjoyed by employees under the age of 40 with respect to the terms and conditions of their employment relationship with defendant and to the enjoyment of all benefits, privileges, terms, and conditions of that relationship.

57. Defendant's conduct deprived Lorenzo of the rights, privileges and immunities guaranteed to her under the ADEA.

58. By reason of defendant's conduct, Lorenzo is entitled to all legal and equitable relief available under the ADEA.

*Count V*

<u>New York Human Rights Law, New York Consolidated Laws, Executive Law – EXC §290 et seq.</u>

59. Plaintiff restates and realleges paragraphs 1-58, inclusive, as though set forth here in full.

60. Defendant's conduct described above, because of her race, age, and disability, and in retaliation for Lorenzo complaining about defendant's race, age, and disability discrimination, violated Section 296(a) of the New York Human Rights Law.

61. Defendant's conduct described above deprived Lorenzo of the rights, privileges and immunities guaranteed to her under the New York Human Rights Law.

62. By reason of defendant's discrimination and retaliation, Lorenzo is entitled to all legal and equitable relief available under the New York Human Rights Law.

*Jury Demand*

63. Lorenzo hereby demands a trial by jury as to all issues so triable.

*Prayer for Relief*

Wherefore, Plaintiff, Alexis Lorenzo, respectfully prays that the Court:

a. adjudge, decree and declare that defendant engaged in illegal discrimination and retaliation, and that the actions and practices of defendant complained of herein are violative of her rights under Title VII, Section 1981, the ADA, the ADEA, and the New York Human Rights Law;

b. order defendant to provide appropriate job relief to Lorenzo;

c. enter judgment in favor of Lorenzo and against defendant for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, past and future mental anguish and pain and suffering, in amounts to be determined at trial;

    d.    order defendant to pay the attorney's fees, costs, expenses and expert witness fees of Lorenzo associated with this case;

    e.    grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable; and

    f.    retain jurisdiction until such time as the Court is satisfied that defendant has remedied the unlawful and illegal practices complained of herein and is determined to be in full compliance with the law.

_____
Alexis Lorenzo, Esquire
3702 Paulding Avenue
Bronx NY 10469
215 266 8203 tel

-and-

Robert T Vance Jr, Esquire
Law Offices of Robert T Vance Jr
123 South Broad Street, 15th Floor
Philadelphia PA 19110
267 887 0172 tel / 215 501 5380 fax
rvance@vancelf.com
*Pro Hac Vice pending*

*Attorneys for Alexis Lorenzo*